IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: : | |
| : | CHAPTER 7 |
| VINCENT A. PIAZZA, III, : | |
| : | CASE NO. 5:18-bk-02300-HWV |
| Debtor, : | |
| : | |
| PATRICIA ELLIOTT, : | |
| : | ADVERSARY NO. 5:18-ap-00101-HWV |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| VINCENT A. PIAZZA, III, : | |
| : | Nature of Proceeding: 62 Dischargeability |
| Defendant. : | |

## OPINION

This matter comes before the Court by way of an Amended Adversary Complaint filed by Plaintiff, Patricia Elliott ("Elliott") in which she seeks a determination that a debt owed to her by Debtor-Defendant Vincent A. Piazza, III ("Piazza") is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). For the reasons that follow, the Court rules against Elliott and finds that this debt is dischargeable.

I. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(a). This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(J) (objections to discharge).

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 2011, Elliott and Piazza resided in Ketchikan, Alaska. (Doc. 127, p. 4.)[1] Elliott was the cardholder of two Alaska Airlines credit cards. (*Id.*) Piazza operated a flooring business and owned several properties. (*Id.* at 4, 8.) Sometime in 2011, the parties entered into an oral

---

[1] For ease of reference, and where appropriate, the Court utilizes the page numbers from the CM/ECF footer.

1

contract regarding the use of Elliott's Alaska Airlines credit cards ending in 6957 (the "6957 Card") and 4194 (the "4194 Card" and, collectively with the 6957 Card, the "Cards") whereby Piazza and his wife would each be added to the Cards as authorized users and be permitted to use them for both business and personal use. (*Id.* at 4.) Piazza agreed to make payments on the Cards for charges he and his wife incurred. (*Id.*) The parties agreed to share the resulting airline miles as they accrued. (*Id.*)

At first, the arrangement worked as planned; Piazza made charges and timely payments on the Cards.[2] (*Id.*) However, by March 2012, the statements for the Cards reflected a combined balance of $33,951.05 that Piazza had not paid. (*Id.*) Around this time, Piazza asked Elliott to request a credit limit increase. (Elliott Ex. 16.) On April 2, 2012, Elliott agreed to ask for an increase but stated that she would like some sort of security that the Cards would be paid in case "something unforeseen should happen." (*Id.*) Piazza responded by noting that his business had over $1.5 million worth of work over the next twelve months, and that he also had six properties with "a ton of equity" that he could sell to make payments on the Cards. (*Id.*) He also offered to add Elliott as a first loss payee on a life insurance policy to guarantee payment on the Cards in the event that he was unable to repay them. (*Id.*) Elliott never responded to this offer and it does not appear that the parties discussed the issue further or otherwise took any additional action regarding security for Elliott in the event that Piazza was unable to make payments on the Cards.[3] (Trial Tr. pp. 41–42.)

---

[2] Indeed, the credit card statements for the 6957 Card reflect that between the January 2012 and March 2012 statements, Piazza made over $68,000 in charges and more than $77,000 in payments. (Elliott Ex. 10.) Over the same period, the credit card statements for the 4194 Card reflect charges totaling approximately $6,000 and payments totaling approximately $7,500. (Elliott Ex. 12.) Thus, between the two Cards, Piazza charged more than $74,000 and made payments of more than $84,500 between the January 2012 and March 2012 statements. (Elliott Ex. 10, 12.)

[3] It is also unclear whether the credit limit increase occurred. Elliott testified that the credit limit "went up to $40,000" following the request. (Trial Tr. p. 24.) However, the credit card statements provided to the Court show that the credit

2

Thereafter, the parties' agreement continued as anticipated. The statements for the 6957 Card reflect that between the April 2012 and February 2013 statements, Piazza charged more than $644,000 and made payments totaling more than $595,000. (Elliott Ex. 10–11.) The statements for the 4194 Card reflect that Piazza charged more than $50,000 and made payments totaling more than $45,000 over the same period. (Elliott Ex. 12–13.) Thus, collectively, Piazza charged more than $694,000 and made payments of more than $640,000 between April 2012 and February 2013. (Elliott Ex. 10–13.) The Cards carried a combined balance of approximately $68,500 as of the February 2013 statements. (*Id.*)

During this time, Piazza's business began experiencing financial trouble due to non-payment on several large projects. As a result, Piazza began to fall behind on payments on the Cards. (Trial Tr. pp. 32, 11–12.) Indeed, by March 12, 2013, the 6957 Card carried an unpaid balance of $66,158.65.[4] (Elliott Ex. 11.) Accordingly, on March 13, 2013, Elliott asked Piazza to make payments on the Cards to bring the accounts below their respective credit limits. (Elliott Ex. 20.) Piazza responded that he would make payments as soon as possible, and that he was waiting on receivables totaling $231,000 to completely pay off the balance. (*Id.*) On April 10, 2013, Elliott once again asked Piazza to make payments on the accounts to bring them below their respective credit limits. (Elliott Ex. 18.) Piazza indicated that he would be able to make payments in the next week and that he would not exceed the Cards' credit limits again. (*Id.*)

---

limit on the 6957 Card did not change. (Elliott Ex. 10–11.) Likewise, the statements for the 4194 Card show that the credit limit was $13,000 during the entire period in question. (Elliott Ex. 12–14.)

[4] Elliott did not provide the Court with a copy of the 2013 statements for the 4194 Card. While Exhibit 13 purports to be the 2013 statements for the 4194 Card, it appears that the exhibit is actually a re-print of Exhibit 12, which are the 2012 statements for the 4194 Card. However, based on the $7,894.21 ending balance as of the December 2012 statement, and the $12,868.72 beginning balance as of the January 2014 statement, which were admitted as exhibits, the Court surmises that there were at least some additional charges on the 4194 Card. (Elliott Ex. 12, 14.)

3

Following this exchange, Piazza continued to make charges and payments on the Cards when he was able.[5] (Elliott Ex. 11.)

On July 23, 2013, Piazza emailed Elliott to inform her that he and his wife would no longer be using the Cards and that Elliott could cancel them. (Elliott Ex. 22.) He also indicated that he would pay off the balances on the Cards once he received payment from several summer projects, which he estimated to be worth $500,000. (*Id.*) He anticipated being paid by the end of September. (*Id.*) Following this email, the charges on the Cards largely stopped, decreasing from tens of thousands of dollars charged per month to zero within a matter of weeks. (Elliott Ex. 10–16.) The final charge on the 6957 Card was a $149 charge on September 27, 2013 and the final charge on 4194 Card was a $718.01 charge on December 29, 2013. (Elliott Ex. 11, 14.)

After he stopped using the Cards, it appears that Piazza attempted to pay down the debt by making small payments toward the accruing interest. (*See* Elliott Ex. 11, 14.) In total, Piazza made payments of $3,185 on the 6957 Card and at least $4,190 on the 4194 Card after the date of the last charge on each respective Card. (Elliott Ex. 11, 14.) During this time, the parties continued to communicate via email, wherein Piazza repeatedly acknowledged that he was behind on his Card payments due to unpaid sums owed to his flooring business, but that he would pay Elliott back when he was able. (Elliott Ex. 24–25.) However, substantial balances remained on both Cards.

On April 10, 2014, Elliott filed a breach of contract action against Piazza in the District Court for the State of Alaska First Judicial District at Ketchikan based on his failure to pay off the balances on the Cards (the "State Court Action"). (Elliott Ex. 4.) Elliott was awarded

---

[5] Indeed, the July 2013 statement for the 6957 Card shows an ending balance of $37,631.76. (Elliott Ex. 11.)

4

$82,766.06 across three judgments from the State Court Action (the "State Court Judgments"), which included attorney's fees and interest. (Elliott Ex. 7–9.)

On May 31, 2018, Piazza filed a Chapter 7 bankruptcy petition. Thereafter, on September 4, 2018, Elliott filed the instant adversary proceeding seeking a determination from this Court that the debt owed to her from the State Court Judgments is non-dischargeable. The Court conducted a trial on this issue on March 16, 2022. The parties submitted post-trial briefs on April 12, 2022, and May 12, 2022, respectively. (Docs. 127, 129.) After review of the trial testimony, exhibits, and post-trial briefs, the Court is prepared to rule.

**III. ANALYSIS**

Actions to determine the dischargeability of debt are governed by 11 U.S.C. § 523(a). In dischargeability proceedings, the creditor carries the burden to prove by a preponderance of the evidence that the debt is non-dischargeable. *Grogan v. Garner*, 498 U.S. 279, 285 (1991). As the Court has already noted in this case, "exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors." (Doc. 23, p. 4 (collecting cases).)[6]

In this case, Elliott asserts that the debt owed to her pursuant to the State Court Judgments should be declared non-dischargeable under either § 523(a)(2)(A) or § 523(a)(2)(B).[7] In support of her position, Elliott argues that Piazza maintained "unfettered use of Elliott's credit to charge purchases for several years" by "making repeated false assurances to Elliott . . . that he intended imminent payment, when the circumstances and timing of his repeated broken promises make it clear that he had no intention to do so at the time the promises were made." (Doc. 127,

---

[6] Though not published by the undersigned, the Court previously issued two opinions in this case on dispositive motions. To avoid confusion, the Court will refer to its opinion at docket number 10 in the above-captioned matter as "Piazza I" and its opinion at docket number 23 in the above-captioned matter as "Piazza II."

[7] The Court notes that relief under § 523(a)(2)(A) and § 523(a)(2)(B) is mutually exclusive. *In re Coley*, 433 B.R. 476, 492 n.21 (Bankr. E.D. Pa. 2010). Therefore, the Court will interpret Elliott's arguments under § 523(a)(2)(A) and § 523(a)(2)(B) as though they are argued in the alternative.

5

p. 14.)  In response, Piazza generally states that there is no evidence to support the assertion that he never intended to repay his obligations to Elliott at the time they were incurred, and that without such evidence, the debt owed to Elliott is dischargeable.  (Doc. 129, pp. 6–7.)  The Court considers these arguments in turn.

### A.  11 U.S.C. § 523(a)(2)(A)

Under § 523(a)(2)(A) of the Bankruptcy Code, a Chapter 7 discharge "does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  In other words, as stated in *Piazza II*, to prove that the State Court Judgments are non-dischargeable under § 523(a)(2)(A), Elliott must show that

> (1) the debtor made a false representation; (2) the debtor knew the representation was false when it was made; (3) the debtor intended to deprive the creditor or to induce him to act upon the representation; (4) the creditor justifiably relied upon the representation; and, (5) the creditor sustained a loss as a proximate result of the representation.

(Doc. 23, p. 6 (citing *In re Griffith*, No. 1:13-bk-4362, 2014 WL 4385743, at *3 (Bankr. M.D. Pa. Sept. 4, 2014); *In re Ritter*, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009)).)

To satisfy the above elements, Elliott must rely on a statement "*other than* a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A) (emphasis added).  A statement is "respecting" a debtor's financial condition "if it has a direct relation to or impact on the debtor's overall financial status."  *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).  Further, a statement about a single asset can be a "statement respecting the debtor's financial condition."  *Id.* (noting that "a single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a Debtor's

6

Case 5:18-ap-00101-HWV    Doc 132    Filed 11/04/22    Entered 11/04/22 12:01:05    Desc
Main Document    Page 6 of 12

overall financial condition and can help indicate whether a Debtor is solvent or insolvent, [or] able to repay a given debt or not").

Elliott asserts that Piazza made a series of false representations in eight emails between April 2012 and April 2014 that she contends were made to induce her to allow Piazza to retain access to the Cards despite his nonpayment. (Doc. 127, p. 14.)[8] These eight emails form the basis of Elliott's entire argument. Aside from the general allegation that Piazza made repeated broken promises to repay the debt, Elliott alleges that Piazza specifically lied about the number of properties that he owned, the equity that existed in those properties, and his ability to pay her from specific sources of funds, including the sale of those properties and income from two large projects relating to his business. (*Id.* at 17.)

The Court finds that Piazza's statements regarding the number of properties that he owned and the equity in those properties, as well as his ability to pay Elliott from the sale of his properties and his pending receivables for his business are fairly classified as statements that have a "direct relation to or impact on the [D]ebtor's overall financial status." *Appling*, 138 S. Ct. at 1761. As such, the Court concludes that these statements cannot be relied upon to support Elliott's assertion that the State Court Judgments are non-dischargeable pursuant to § 523(a)(2)(A). Therefore, Elliott's argument in favor of non-dischargeability of the State Court Judgments under § 523(a)(2)(A) accordingly fails. The Court thus turns to Elliott's alternative argument in favor of non-dischargeability: § 523(a)(2)(B).

**B. 11 U.S.C. § 523(a)(2)(B)**

Under § 523(a)(2)(B) of the Code, a debtor does not receive a Chapter 7 discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the

---

[8] The emails are dated April 2, 2012; "May of 2012;" March 13, 2013; April 10, 2013; July 23, 2013; September 3, 2013; February 13, 2014; and March 7, 2014. (Elliott Ex. 16–18, 20–22, 24–25.)

7

Case 5:18-ap-00101-HWV    Doc 132    Filed 11/04/22    Entered 11/04/22 12:01:05    Desc
Main Document    Page 7 of 12

extent obtained by . . . use of a statement in writing[9] . . . (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." (Doc. 23, p. 8 (citing 11 U.S.C. § 523(a)(2)(B)).) In short, a debtor may not discharge a debt in Chapter 7 to the extent that such debt was obtained by materially misrepresenting the debtor's financial condition in writing when such writing was made intending to deceive the creditor and the creditor reasonably relied on the representation. (*See id.*)

Importantly, success on a § 523(a)(2)(B) claim requires a showing of intent to deceive.[10] "[A] broken promise to repay a debt, without more," is insufficient to prove such intent to deceive. *In re Singh*, 433 B.R. 139, 161 (Bankr. E.D. Pa. 2010). Otherwise "every breach of contract would give rise to a nondischargeability claim[.]" *Id.* "[B]ecause a debtor will rarely, if ever, admit that deception was his purpose, intent to deceive may be inferred from the totality of the surrounding facts and circumstances." *In re Adesanya*, 630 B.R. 435, 452 (Bankr. E.D. Pa. 2021) (citations omitted); *see also In re Cohn*, 54 F.3d 1108, 1119 (3d Cir. 1995). In addition, "a creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an inference." *In re Adesanya*, 630 B.R. at 452 (citing *In re Williams*, No. 15-23287, 2018 WL 3344174, at *16 (Bankr. D.N.J. July 05, 2018)).

---

[9] As mentioned in *Piazza II*, an email can satisfy the "writing" requirement of § 523(a)(2)(B). (Doc. 23, p. 9 (citing *In re Owens*, 549 B.R. 337, 351 (Bankr. D. Md. 2016); *In re Hambley*, 329 B.R. 382, 399 (Bankr. E.D.N.Y. 2005); *In re May*, 579 B.R. 568, 589 & n.79 (Bankr. D. Ut. 2017)).)

[10] The Court notes that for purposes of § 523(a)(2)(A) and § 523(a)(2)(B), the intent requirement is the same. *See In re Pfender*, 2022 WL 696947, at *8 (noting that "the intent to deceive . . . element[] of [a] § 523(a)(2)(A) claim appl[ies] equally with respect to [a] § 523(a)(2)(B) claim").

In this case, the Court finds that the record is devoid of any evidence indicating that Piazza intended to deceive Elliott in writing or otherwise in order to retain access to the Cards despite his non-payment. Indeed, the record in this case shows the opposite. A cursory review of the credit card statements reveals substantial payments on both Cards during the period in question. With regard to the 6957 Card, the statements reflect that between February 2012 and July 2013, Piazza made over $850,000 of charges and more than $800,000 in payments. (Elliott Ex. 10–16.) Over the same period, the statements for the 4194 Card reflect charges totaling approximately $52,000 and payments totaling approximately $36,000. (*Id.*) Thus, between the two Cards, Piazza charged approximately $902,000 and made payments of approximately $836,000 between February 2012 and July 2013. (*Id.*) While the Court acknowledges that no payments were made in certain months, it is noteworthy that in other months, payments were made that far exceeded the balance due that month. Therefore, Piazza's substantial payment history on the Cards completely undermines Elliott's assertion that Piazza never intended to repay his debts.

The Court also notes that in the July 23, 2013 email, Piazza acknowledged the outstanding debt owed to Elliott and told her that she could cancel the Cards because he would no longer be making charges on the accounts. (Elliott Ex. 22.) While Elliott contends that there were additional charges on both Cards after Piazza's July 23, 2013 email,[11] Piazza credibly testified, without opposition, that those charges were most likely "several reoccurring monthly payments" whose accounts were set up to automatically charge the Cards. (Trial Tr. 3–9, 79.) Piazza's testimony is consistent with the record evidence since the number of charges dropped precipitously after July 23 and nearly all of the charges in these months are from a handful of

---

[11] Charges post-dating the July 23, 2013 email total approximately $15,000 on the 6957 Card and at least $6,300 on the 4194 Card. (Elliott Ex. 10–16.)

9

vendors, many of which appear in the same dollar amount each month, consistent with a reoccurring charge. (Elliott Ex. 11.) Despite these additional charges, the Court notes that Piazza continued to make more than $9,000 in payments on the Cards over the same period. Therefore, the Court finds that the July 23, 2013 email was not made with the intent to deceive Elliott, and cannot support her § 523(a)(2)(A) claim.

Moreover, the Court notes that the totality of the circumstances in this case do not indicate that Piazza intended to deceive Elliott. Piazza credibly testified that he always intended to repay the balances on the Cards, but that due to unforeseen circumstances with his business, he was ultimately unable to do so. As the Court has already stated, "a broken promise to repay a debt, without more," is insufficient to prove such intent to deceive. *In re Singh*, 433 B.R. at 161. Otherwise "every breach of contract would give rise to a nondischargeability claim[.]" *Id.* Elliott has failed to indicate any facts, other than the existence of her State Court Judgments, that would give rise to an inference that Piazza intended to deceive her at any point while Piazza and his wife were authorized users on her Cards.[12]

For the foregoing reasons, the Court finds that Elliott has failed to establish that the State Court Judgments are exempted from Piazza's Chapter 7 discharge under 11 U.S.C. § 523(a)(2)(B).[13]

---

[12] While Elliott asserts that Piazza intentionally misrepresented the number of properties he owned as well as his equity in these properties over the course of several emails he sent her, which she asserts should give rise to an inference of his intent to deceive her, the Court finds that these emails do not support her position. Indeed, Elliott bases her assertion that Piazza misrepresented these facts on unforeseen factual developments in this case which post-date the emails at issue. Elliott failed to contradict Piazza's testimony that these facts were true as of the date he represented to her that they were true. Therefore, the Court does not construe Piazza's emails as intending to deceive Elliott for purposes of § 523(a)(2)(B)(iii).

[13] Because Elliott failed to meet her burden of establishing that Piazza intended to deceive her, the Court does not consider the remaining elements under § 523(a)(2)(B).

### C. Collateral Estoppel

At prior stages of this case, Elliott argued that the Court should give preclusive effect to the State Court Judgments. Though Elliott did not maintain this argument at trial or discuss it in her brief, Piazza's brief nevertheless continued to raise the issue. To the extent the argument has not already been waived due to its lack of inclusion in post-trial briefing, the Court finds that collateral estoppel is inapplicable here.

Under Pennsylvania law, collateral estoppel applies when:

(1) an issue is identical to one that was presented in a prior case;

(2) there has been a final judgment on the merits of the issue in the prior case;

(3) the party against whom the doctrine is asserted was a party in, or in privity with a party in, the prior action;

(4) the party against whom the doctrine is asserted, or one in privity with the party, had a full and fair opportunity to litigate the issue in the prior proceeding; and

(5) the determination in the prior proceeding was essential to the judgment.

*In re Jacobs*, 381 B.R. 128, 142 (Bankr. E.D. Pa. 2008) (citing *Cohen v. Workers' Comp. Appeal Bd.* (*City of Philadelphia*), 909 A.2d 1261, 1264 (Pa. 2006); *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 245–46 (3d Cir. 2006); *In re Randall*, 358 B.R. 145, 164 (Bankr. E.D. Pa. 2006)).

Here, the State Court Judgments were based on a breach of contract action. (Doc. 127, p. 13.) Proving breach of contract under Alaska law does not require proof of intent. *See, e.g.*, *Brooks Range Petroleum Corp. v. Shearer*, 425 P.3d 65, 79 (Alaska 2018) (noting that "[a] breach of contract claim depends on proof of the existence of a contract, breach, and damages"). Conversely, as was discussed at length above, dischargeability proceedings under § 523(a)(2) do require such a finding. Because the State Court Judgments contain no such finding, this Court is

11

Case 5:18-ap-00101-HWV    Doc 132    Filed 11/04/22    Entered 11/04/22 12:01:05    Desc
Main Document    Page 11 of 12

not bound to give them preclusive effect in determining their non-dischargeability, and the Court therefore declines to do so.

IV. CONCLUSION

For the foregoing reasons, the Court finds that the State Court Judgments are dischargeable in the Debtor's Chapter 7 case.

An appropriate Order will follow.

By the Court,

_____
Henry W. Van Eck, Chief Bankruptcy Judge
Dated: November 4, 2022